1
2
3
4
5
6
7

**CARROLL, KELLY, TROTTER & FRANZEN**
**JOHN C. KELLY (SBN 125609)**
**GABRIEL M. IRWIN (SBN 210916)**
111 West Ocean Boulevard, 14th Floor
Post Office Box 22636
Long Beach, California 90801-5636
Telephone No. (562) 432-5855 / Facsimile No. (562) 432-8785
jckelly@cktflaw.com / gmirwin@cktflaw.com

Attorneys for Defendant, CITY OF ONTARIO

8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11  DANIEL TRIPPIEDI, an individual, | CASE NO.:  5:20-cv-01190-AB-SHK |
| 12                      Plaintiff, | **DEFENDANT CITY OF ONTARIO'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) AND 9(B); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| 13           vs. | |
| 14  CITY OF ONTARIO, a government entity; and DOES 1-10, inclusive | |
| 15 | |
| 16                      Defendants. | |
| 17 | |
| 18 | Judge ANDRE BIROTTE, JR. |
| 19 | DATE: MAY 7, 2021 |
| 20 | TIME: 10:00 A.M.<br>Courtroom: 7B |
| 21 | |
| 22 | Complaint Filed: 6/11/20<br>Second Amended Complaint |
| 23 | Filed: 3/3/21<br>Discovery Cut-Off: 7/8/21 |
| 24 | Pre-Trial Conference: 11/19/21<br>Trial Date: 12/7/21 |
| 25 | |
| 26 | [[Proposed] Order filed and served concurrently herewith] |
| 27 | |
| 28 | |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 7, 2021 at 10:00 A.M., in Courtroom 7B of the United States Court, Central District of California, located at 350 W. 1st Street, Los Angeles, CA 90012-4565, Defendant CITY OF ONTARIO (hereinafter "MOVING DEFENDANT") will and hereby does move, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing, without leave to amend, the Second Amended Complaint of Plaintiff on the following grounds:

**Third Cause of Action – Intentional Infliction of Emotional Distress**

1.      The third cause of action for Intentional Infliction of Emotional Distress should be dismissed as to MOVING DEFENDANT for failure to state a claim pursuant to Rule 12(b)(6).

**Fourth Cause of Action – Negligent Infliction of Emotional Distress**

1.      The fourth cause of action for Negligent Infliction of Emotional Distress should be dismissed as to MOVING DEFENDANT for failure to state a claim pursuant to Rule 12(b)(6).

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, all other pleadings and papers on file in this action, any oral argument at the hearing on the Motion, and any further matters of which this Court may take judicial notice.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1        This Motion is made following the conference of counsel pursuant to Local

2  Rule 7-3.

3

4  DATED:  April 2, 2021          CARROLL, KELLY, TROTTER &

5                                     FRANZEN

6

7                        By:

8                            JOHN C. KELLY

9                            GABRIEL M. IRWIN

                              Attorneys for Defendant

10                          City of Ontario

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT

# <u>TABLE OF CONTENTS</u>

I.     **INTRODUCTION**...............................................................................................6

II.    **STATEMENT OF RELEVANT ALLEGATIONS** .....................................6

III.   **LEGAL ARGUMENT**.....................................................................................14

       A.    **Legal Standard of a Motion to Dismiss.**.............................................14

       B.    **Plaintiff Cannot State a Claim for Intentional Infliction of Emotional Distress and the Cause of Action Cannot Survive a Motion to Dismiss.** .........15

       C.    **Plaintiff Cannot State a Claim for Negligent Infliction of Emotional Distress and the Cause of Action Cannot Survive a Motion to Dismiss.** ......................18

IV.   **CONCLUSION** ...............................................................................................20

# TABLE OF AUTHORITIES

**Federal Cases**

*Ashcroft v. Iqbal*  (2009) 556 U.S. 662 ................................................. 14

*Bell Atl. Corp. v. Twombly*  (2007) 550 U.S. 544  ................................. 14

*Durning v. Citibank*  (9th Cir. 1993) 990 F.2d 1133 ......................... 14 Psych_Cite_7

*United States v. Stanley*  (1987) 483 U.S. 669  .................................... 14

**State Cases**

*Burgess v. Superior Court*  (1992) 2 Cal.4th 1064 .............................. 18

*Christensen v. Superior Court*  (1991) 54 Cal.3d 868 ..................... 15, 18

*Cochran v. Cochran*  (1998) 65 Cal.App.4th 488  ............................... 15

*Fowler v. Varian Assocs.*  (1987) 196 Cal.App.3d 34 .......................... 16

*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.*  (1989) 48 Cal.3d 583 . 18

*Molien v. Kaiser Foundation Hospitals*  (1980) 27 Cal.3d 916 ...................... 18,19

*Ragland v. U.S. Bank National Assn.*  (2012) 209 Cal.App.4th 182 ................... 18

*United States Liability Ins. Co. v. Haidinger-Hayes, Inc.*  (1970) 1 Cal.3d 586 .. 18

*Vasquez v. Franklin Management Real Estate Fund, Inc.*  (2013) 222 Cal.App.4th 819 ................................................................. 16

**Other**

Fed. Rules of Civ. Proc., Rule 8 ........................................................ 14

Fed. Rules of Civ. Proc., Rule 8(a)(2) ............................................... 14

Fed. Rules of Civ. Proc., Rule 12(b)(6) ............................................. 14

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Following Plaintiff Daniel Trippiedi's unsuccessful First Amended Complaint, he has now filed a Second Amended Complaint (hereinafter "SAC") against defendant CITY OF ONTARIO (hereinafter "ONTARIO" or "MOVING DEFENDANT"). In addition to the causes of action for Violation of the Americans with Disabilities Act of 1990 and Violations of the Unruh Civil Rights Act previously asserted within the initial Complaint, plaintiff again attempts to assert two additional causes of action within the SAC. This includes the third cause of action for Intentional Infliction of Emotional Distress ("IIED") and the fourth cause of action for Negligent Infliction of Emotional Distress ("NIED").

Plaintiff's SAC comes on the heels of his unsuccessful First Amended Complaint ("FAC"). The third cause of action for IIED and fourth cause of action for NIED within the FAC were previously dismissed by this Court based upon plaintiff's failure to state claims for IIED or NIED. Plaintiff, desperate to expand the scope of this lawsuit, tries again to state claims for IIED and NIED. He again fails in his attempts.

As was the case with the FAC, the SAC again inappropriately attempts to convert an action based purely upon alleged violations of civil rights to one involving purported intentional and negligent acts allegedly causing emotional distress. Such causes of action again fail to pass legal muster as pled, and again fail as a matter of law. Accordingly, MOVING DEFENDANT respectfully requests that the third and fourth causes of action be dismissed without leave to amend.

## II.   STATEMENT OF RELEVANT ALLEGATIONS

The following constitute the new/additional allegations pled within plaintiff's SAC which purport to support plaintiff's third and fourth causes of action:

/ / /

/ / /

### 1.     The "New" Allegations Pled Within The FAC And Again In The SAC

- Defendants also caused Plaintiff severe emotional distress by, but not limited to, denying Plaintiff the company of his family in the accessible seating area of the facility and verbally accosting Plaintiff when he sought a reasonable accommodation. (See SAC at Para. 14).

- Plaintiff went to the Business to attend a graduation ceremony for his stepdaughter. His group consisted of he, his stepdaughter, her mother (plaintiff's wife), and his stepdaughter's two children. Plaintiff offered to drive his family in his van to save time and gas and so they all could enjoy the event together. His wife, he and the two grandchildren were all very proud of his stepdaughter for getting her degree. He assured his stepdaughter, who was very excited and nervous, that he would get her there on time and that his wife and he would take care of the grandchildren and make sure they saw their mom graduate. (See SAC at Para. 15).

- Plaintiff had assumed prior to attending the event that he would be permitted to park in an ADA accessible parking space which he needs because he is wheelchair bound. On that day his wife also suffered from a medical condition which required her to use an orthopedic boot that her doctor prescribed for the bone condition she has. His wife was initially reluctant to go with the attending family because she was unable to walk very far and did not want her mobility issues to slow down or interfere with the family all having a good time. Plaintiff finally persuaded her to go by explaining that he would be able to park close to the entrance and that she could share the benefit of wheelchair access that he himself would be afforded. (See SAC at Para. 16).

- When they arrived at the Arena, Plaintiff was directed by parking attendants who told him which way to go to get to the disabled accessible parking area. He then followed the directions of the several parking attendants along the

route in the Arena parking lot. When he arrived at the disabled accessible parking area, he noticed that the spaces were all blocked off with metal rails. He then asked one of the parking attendants to move one of the rails to allow him to pull into one of the ADA spaces. In response, Plaintiff was told that by that particular attendant that this area was restricted and that Plaintiff could park in another area a little further down the way. Plaintiff explained to the attendant that he needed to park close because of his disability requiring that he use a wheelchair. The attendant then told Plaintiff that the attendant's superiors had instructed him that no one was to use the parking area in the ADA spaces near the entrance. That attendant then directed Plaintiff to another parking lot. At this point, Plaintiff let his stepdaughter disembark near the entrance so she would not have to worry about the family. He stated that to her because he had hoped that he would be able to enter together with her so he could show her where the family would be sitting which would allow her to see the family wave to her when she crossed the stage. His stepdaughter was disappointed and concerned that she would not know where the family was seated so she could wave to her daughters. Plaintiff apologized to his stepdaughter for the inconvenience and pushed on with the rest of the family. (See SAC at Para. 17).

- When he arrived at the parking area where he was told he could park, Plaintiff noticed that it was already partially full and did not have any ADA spaces nor any spaces close to the entrance. Plaintiff then had to try to park his van very close to the right side of the space to hopefully avoid being blocked in by someone parking too close for him to get to (and open) his door when the family returned to the van from the event. This created a problem for his wife and the two granddaughters being able to exit from the passenger side of the van. Because of that, he had to allow them to get out of the van before he pulled into the parking space. Plaintiff then had to make the long journey to

the entrance in his wheelchair with his wife supporting herself by putting her hands on his shoulders behind him, all while they kept their eyes on the kids to make sure they were all safe as they made their way to the non-accessible entrance. (See SAC at Para. 18).

- When the family got to bottom level of the entrance, they had to travel up a long series of switchback ramps that seemed like it was at least a few hundred feet long in order to get to the upper level where they were allowing people to enter the Arena. At that moment, Plaintiff realized that the ADA spaces that had been blocked off were close to another entrance that probably had an elevator for disabled people. However, since they were not allowed to park in the disabled parking area, his family was not able to use the elevator. Instead, he had to push himself up the long switchback ramps which left him and his wife exhausted and in physical pain. (See SAC at Para. 19).

- Once they were inside, they were then directed to a disabled seating area. The woman who was in charge of seating people in that area told Plaintiff that he could only have one person sit in that area with him unless he could get out of his chair and walk to another row of seats below the disabled sitting area. Since he is not able to do ambulate except by wheelchair, he declined. He was incredibly embarrassed as the two grandkids looked at him and were very worried that they would not be able to sit with him and their grandmother. He then explained to the attendant that she should allow him to have his three family members sit next to him especially since the two granddaughters were under ten years old and could not be separated from him and his wife. The attendant said that his wife could use one of the folding chairs and the two kids could either sit on their laps or in the seats in the rows below the disabled seating section. Plaintiff explained that this was not acceptable. (See SAC at Para. 20).

- Another member of the Arena personnel who seemed to have more authority appeared at that time and asked what the problem was. The attendant whom client had been dealing with told the apparent supervisor, "we have a troublemaker here." Plaintiff was horribly embarrassed that his family and other people saw him as a troublemaker. (See SAC at Para. 21)

- Plaintiff then explained the problem to the supervisor but she still sided with the attendant. Thus, since he and his wife did not want the grandkids to sit by themselves two rows below them, his wife decided to sit with them below while he sat by himself in the disabled seating section. As a result, Plaintiff was not able to enjoy the event and coordinate the taking of photos and waving to his stepdaughter together with his family. (See SAC at Para. 22).

- Thereafter, Plaintiff's wife had to come up to the disabled section a few times during the event to share snacks and drinks and to make sure Plaintiff was okay. That meant she had to leave the grandkids alone sitting next to strangers each time. Plaintiff felt terrible that his disability had caused so much trouble for his family members and especially his wife since she was in a boot cast. He was also embarrassed because the grandkids wanted him to be with them and their grandmother. (See SAC at Para. 23).

- When the ceremony began, Plaintiff's stepdaughter did not have a clue where they were seated and was not able to wave to the family when she crossed the stage. A number of other disabled patrons sitting near Plaintiff were discussing the fact that they had the same complaint and commented that the accommodations at this venue for the disabled were awful. The gentleman in a wheelchair sitting next to him told Plaintiff that he was also prevented from using the ADA parking spaces and said he would never come to this place again. (See SAC at Para. 24).

- After the event was over, Plaintiff, his wife and the grandchildren exited the Arena with the crowd. However, the family had a hard time reconnecting with

the stepdaughter. They not only had to travel down the long switchback ramps again, but he had to push himself halfway around the arena to where the graduates were exiting. However, Plaintiff then encountered a curb that prevented him from continuing along with the other people who were going to meet their graduates. This curb was near the area where the blocked off ADA parking was located. He noticed that if one of the railings that were blocking off the area were opened for him, he would be able to get around the curb and get to the area where other families had been able to go. He asked an attendant there to help by opening the railing enough to let him through. The attendant refused. Plaintiff then had to turn around and push himself all the way back to the front of the entrance with his wife and grandkids in tow, not having been able to connect with his stepdaughter. This was extremely frustrating, among other things, because there was no reason why the attendant could not allow him to pass around the railing so he could avoid the architectural barrier presented by the curb. Instead, the family had to wait until most of the people exited the parking lot before they were able to find the stepdaughter. (See SAC at Para. 25).

- The hardships, physical pain, emotional pain and embarrassment that Plaintiff and his family experienced as a result of the incompetence and unlawful policies practiced by Defendants on the day he visited the Business still affects him to this day. Plaintiff felt at the time, and continues to feel that he has lost the confidence that was placed in him by his family because his family was counting on him to make sure they had at least as enjoyable a time as all abled bodied persons had at the Event instead of the resistance and discrimination that the family experienced. This loss of confidence affects him constantly that he cannot provide security and safety for his family. (See SAC at Para. 26).

/ / /

**2.     The "New" Allegations Pled Within The SAC and Not Within The FAC**

- As a senior member in his family, Plaintiff has always felt that he needed to give an example of leadership and help promote a sense of safety and confidence in his other family members, especially his children and grandchildren. After encountering rude and humiliating accusations of being a "troublemaker" by Defendant's employees, Plaintiff looked at the face of his underaged granddaughters and perceived them to be afraid that they would be separated from their grandparents, or that they would not be able to see their mother graduate. (See SAC at Para. 27).

- After encountering Defendant's humiliating and discriminating conduct, Plaintiff felt that he should never have come to this place and felt like he should not try to participate in these types of events ever again, especially with family members. (See SAC at Para. 28).

- These feelings of defeat and humiliation continue to this day. Since encountering Defendant's repeated discriminatory conduct and extremely rude accusations, Plaintiff's interest in going to public gatherings has diminished to such a low point that when his ability to attend Church or the movies was curtailed by the Covid-19 pandemic, he felt relief because it gave an excuse not to put himself in a situation where this type of humiliation might again occur. (See SAC at Para. 29).

- After this incident, Plaintiff feels like an animal that has been mistreated with his tail between its legs and he is now reluctant to venture into similar gatherings. Defendant's conduct severely affected Plaintiff emotionally because, after his injury that began his life in a wheelchair, it had taken him years to build his confidence that people accepted him. Prior to this incident, Plaintiff had gradually built confidence that people like him did not have to be regarded as shut ins or as burdens to society. Plaintiff felt that changes in

law gave further support to his feeling of societal acceptance. However, after the Event, Plaintiff is constantly reminded that this is not true. (See SAC at Para. 30).

- Plaintiff now frequently thinks people will regard him as a "troublemaker" if he speaks out in search of fair and equal treatment. On occasion, Plaintiff now feels that life is just not worth living because people think of him in this way. (See SAC at Para. 31).

- In addition to the extremely rude accusation as a "troublemaker" in front of his family and strangers, Defendant's other discriminatory behavior and conduct was, in combination, outrageous and caused Plaintiff extreme emotional distress. At the start of the Event, Plaintiff felt emotionally distressed by the lack of ADA compliant parking at the Property. When Plaintiff saw that Defendant was not allowing people to park next to the Arena in the designated accessible parking spaces and instead sent him to a section that did not have accessible spaces, Plaintiff became very worried that he would not have the endurance to push his wheelchair from the parking lot to his seating area. (See SAC at Para. 32).

- Even when Plaintiff arrived at his car on the way out of the Event, he encountered yet another effect caused by Defendant's discrimination. Plaintiff had to wait for the owner of the car next to his to leave before he would be able to get into Plaintiff's car. Because this was a very hot day and he and his family were already very tired and frustrated from the treatment inside the Arena, being required to wait even longer because of Defendant's discrimination was another and the final blow of frustration and humiliation. When Plaintiff had to wait in the heat in front of his family caused by Defendant's discriminatory treatment of his disability, Plaintiff felt the most deterred he had ever been about attending public events in the future. (See SAC at Para. 33).

- Plaintiff's feelings of insecurity, anxiety, and humiliation regarding the Event began when he arrived and encountered repeated discrimination and barriers to access, continued during the Event, were exasperated when he was verbally humiliated in front of his family and in public, continued on his way to while he tried to leave the Event, and persist to this day. (See SAC at Para. 34).

- Defendant's repeated discriminatory conduct and abusive comments toward Plaintiff were, in combination, so extreme and outrageous that they caused Plaintiff severe emotional distress, humiliation, futility, and feelings of defeat and that life is not worth living, and deterred him and continue to deter him to this day from going out in public. (See SAC at Para. 35).

## III.   LEGAL ARGUMENT

### A.   Legal Standard of a Motion to Dismiss.

"[I]f the plaintiff fails either to plead a cause of action or to demonstrate the damages are appropriate as a matter of law, the complaint is dismissed under the Federal Rule of Civil Procedure 12(b)(6)." *United States v. Stanley*, 483 U.S. 669, 691 n.7 (1987); *see also Durning v. Citibank*, 990 F.2d 1133, 1135 (9th Cir. 1993).

The court must dismiss any claim that fails to allege facts that rise above speculation and are implausible on their face. Fed. R. Civ. P. 8(a)(2), 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

As instructed in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009): "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*., at 678; "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, at 678-679.

"Second," *Iqbal* instructs: "only a complaint that states a plausible claim for relief survives a motion to dismiss," and determining plausibility is "a context-

1  specific task that requires the reviewing court to draw on its judicial experience and
2  common sense." *Iqbal*, at 679; citation omitted. "But where the well-pleaded facts
3  do not permit the court to infer more than the mere possibility of misconduct, the
4  complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to
5  relief.'" *Iqbal,* at 679; quoting FRCP 8(a)(2).

6      **B.    Plaintiff Cannot State a Claim for Intentional Infliction of**
7            **Emotional Distress and the Cause of Action Cannot Survive a**
8            **Motion to Dismiss.**

9      Plaintiff cannot state a claim for Intentional Infliction of Emotional Distress
10  ("IIED") and, as such, his Third Cause of Action should be dismissed.

11     In *Christensen v. Superior Court* (1991) 54 Cal.3d 868, the Court recounted
12  the elements for a cause of action of IIED that must be pled and proved as follows:
13  "1) extreme and outrageous conduct by the defendant with the intention of causing,
14  or reckless disregard of the probability of causing, emotional distress; (2) the
15  plaintiff's suffering severe or extreme emotional distress; and (3) actual and
16  proximate causation of the emotional distress by the defendant's outrageous
17  conduct...."

18     A person acts with the intent to produce a consequence if: (a) the person acts
19  with the purpose of producing that consequence; or (b) the person acts knowing that
20  the consequence is substantially certain to result. (Restatement Third of Torts:
21  Liability for Physical and Emotional Harm, § 1.) Also, the conduct must be "so
22  extreme as to exceed all bounds that are usually tolerated in a civilized community."
23  *Christensen v. Superior Court* (1991), 54 Cal. 3d 868, 903. Plaintiff must allege
24  conduct "that has been so outrageous in character, and so extreme in degree, as to
25  go beyond all possible bounds of decency, and to be regarded as atrocious, and
26  utterly intolerable in a civilized community." *Cochran v. Cochran* (1998), 65 Cal.
27  App. 4th 488, 494.

28  / / /

In order for a complaint to assert sufficient facts to support a cause of action for IIED, the plaintiff must allege with "great specificity" those acts that are outrageous or extreme. *Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013), 222 Cal.App.4th 819, 825. It is for the court to determine whether conduct is extreme or outrageous. See *Fowler v. Varian Assocs.* (1987), 196 Cal. App. 3d 34, 44.

In the instant matter, even assuming *arguendo* the truth of the allegations pled, the conduct alleged by plaintiff purportedly causing him emotional distress does not meet the standard of extreme and outrageous. Such conduct is not "so extreme as to exceed all bounds that are usually tolerated in a civilized community." Further, plaintiff is unable to appropriately plead/establish intent or reckless disregard by MOVING DEFENDANT.

Significantly, Plaintiff's SAC does not plead any different or additional facts relative to MOVING DEFENDANT'S alleged conduct than those previously pled within Plaintiff's legally deficient FAC. While Plaintiff has asserted additional allegations in the SAC within paragraphs 27-35 which are not contained within the FAC, these additional allegations do not set forth any different/additional events or different/additional conduct by MOVING DEFENDANT beyond the purported events and conduct previously pled within the FAC. Rather, the SAC within paragraphs 27-35 includes only additional allegations as to the alleged impact which MOVING DEFENDANT'S purported conduct has had on him. (See SAC at ¶¶ 27-35).

Based upon the fact that this Court has already previously ruled that the alleged conduct by MOVING DEFENDANT pled with the FAC does not rise to the level of outrageous conduct required to state an IIED claim, and because plaintiff within the SAC has not alleged any additional conduct by MOVING DEFENDANT not pled within the SAC, the third cause of action for IIED again fails for the identical reasons said cause of action failed within the FAC.

As this Court stated within its Order Granting Motion to Dismiss First Amended Complaint, "While Defendant's conduct may be rude, insensitive or distasteful, it does not rise to the level of what courts have found to be "extreme and outrageous." Such conduct typically includes threats of physical harm, severe invasions of privacy, and extremely rude comments, often in combination." (See Order at 6:10-13).

As this Court also stated within its Order Granting Motion to Dismiss First Amended Complaint, "This case is more appropriately compared to *Cornell v. Berkeley Tennis Club*, wherein a severely obese employee was repeatedly pestered by her employer (citation omitted). The employer allegedly laughed at the employee, asked her if she had considered weight-loss surgery, had her repeat many times that she wore a "women's size 5X to &X," and in a meeting he said she "ha[d] not been cooperative" about following the new dress-code, despite the business only providing her a uniform in a size 2X (citation omitted). The Court ultimately held that the Defendant's actions were "inappropriate but not severe." (citation omitted)." (See Order at 6:22-28; 7:1-2)

As this Court further stated within its Order Granting Motion to Dismiss First Amended Complaint, "These cases confirm that many troubling actions such as what Plaintiff endured are perhaps colloquially "extreme and outrageous," but as a matter of law, inadequate under a theory of IIED. Defendant's conduct as currently asserted in the FAC is similarly inadequate." (See Order at 7:7-10). "Accordingly, Plaintiff fails to allege conduct by MOVING DEFENDANT that rises to the level of outrageous conduct required to state an IIED claim." (See Order at 7:11-12).

Based upon the fact that Plaintiff's SAC has not alleged any additional conduct or actions by MOVING DEFENDANT beyond that which was previously alleged in the FAC, and because the third cause of action for IIED within the FAC was previously determined to be inadequate as a matter of law, it follows the third

1  cause of action for IIED within the SAC is also identically inadequate as a matter of

2  law. This Motion should therefore be granted in its entirety, without leave to amend.

3      C.      **Plaintiff Cannot State a Claim for Negligent Infliction of**

4              **Emotional Distress and the Cause of Action Cannot Survive a**

5              **Motion to Dismiss.**

6          Negligent Infliction of Emotional Distress ("NIED") is not a separate tort but

7  is merely negligence, to which the traditional elements apply. *Marlene F. v.*

8  *Affiliated Psychiatric Med. Clinic, Inc.* (1989) 48 Cal. 3d 583, 588. To state a claim

9  for negligence, a plaintiff must allege facts that support (1) that the defendants owed

10 plaintiffs a duty of care, (2) that the defendants breached that duty, (3) that the breach

11 was the proximate cause of, (4) the resulting injury. *See United States Liab. Ins. Co.*

12 *v. Haidinger-Hayes, Inc*. (1970) 1 Cal. 3d 586, 594.

13         A "direct victim" case is one in which the plaintiff's claim of emotional

14 distress is based on the violation of a duty that the defendant owes directly to the

15 plaintiff. *Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 205.

16 Plaintiffs can recover damages as "direct victims" in only three types of factual

17 situations: (1) the negligent mishandling of corpses (*Christensen v. Superior Court*

18 (1991) 54 Ca.3d 868, 879); (2) the negligent misdiagnosis of a disease that could

19 potentially harm another (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d

20 916, 928); and (3) the negligent breach of a duty arising out of a preexisting

21 relationship (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1076.

22         Under a claim for NIED, "serious mental distress may be found where a

23 reasonable man, normally constituted, would be unable to adequately cope with the

24 mental stress engendered by the circumstances of the case." *Molien v. Kaiser*

25 *Foundation Hospitals* (1980) 27 Cal.3d 916, 927-928).

26         This Court has previously ruled that a duty of due care can be imposed by law,

27 and that the ADA does so. (See Order at 8:8-10; 8:18-20). However, as the SAC

28 again pleads no additional conduct or actions by MOVING DEFENDANT beyond

1  those contained within the legally deficient FAC,  the SAC again fails to establish
2  serious mental distress resulting from negligence. This is because plaintiff cannot
3  meet the standard of causation of serious mental distress which would establish a
4  claim for NIED.

5      It is true that the SAC does include additional allegations which purport to
6  establish the manner in which the alleged events in question have personally
7  impacted him. However, the bottom line continues to be that <u>the SAC is devoid of</u>
8  <u>any allegations that would show that severe emotional distress would be rational</u>
9  <u>from the events as pled/alleged</u>.

10      It is this irrational response to the alleged events in question which results in
11  plaintiff's failure to state a claim for NIED. There is absolutely nothing whatsoever
12  in terms of MOVING DEFENDANT'S alleged conduct, actions, or inactions, that
13  would render "a reasonable man…unable to adequately cope with the mental stress
14  engendered by the circumstances of the case." *Molien v. Kaiser Foundation*
15  *Hospitals* (1980) 27 Cal.3d 916, 927-928). Accordingly, plaintiff can amend his
16  complaint endlessly, adding allegation after allegation of the emotional distress he
17  has purportedly suffered. This will never change the fact that *no reasonable man*
18  would be unable to adequately cope with the consequences of the events alleged.

19      To illustrate, Plaintiff did not witness the death of a family member due to
20  MOVING DEFENDANT'S purported negligence. Plaintiff did not witness the
21  occurrence of a horrific injury to a loved one. To the contrary, the events allegedly
22  experienced by Plaintiff while visiting the Toyota Arena would be incapable of
23  producing a level of emotional distress above and beyond the general damages
24  already pled in this case, such that a reasonable man could not cope. In the end, a
25  legally tenable NIED claim cannot be stated based upon the events in question.

26      Accordingly, plaintiff's fourth cause of action for NIED is legally deficient
27  and this Motion to Dismiss should be granted.
28  / / /

1  **IV.    CONCLUSION**

2          Based upon the foregoing, Defendant CITY OF ONTARIO respectfully asks

3  the Court to dismiss Plaintiff's Second Amended Complaint without leave to amend.

4

5  DATED:  April 2, 2021                  CARROLL, KELLY, TROTTER &
                                          FRANZEN
6

7

8                                         By: _____
9                                              JOHN C. KELLY
                                               GABRIEL M. IRWIN
10                                             Attorneys for Defendant
                                               City of Ontario
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

3
4
5
6
7

I HEREBY CERTIFY THAT ON APRIL 2, 2021, I ELECTRONICALLY FILED THE FOREGOING **DEFENDANT CITY OF ONTARIO'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) AND 9(B); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** WITH THE CLERK OF THE UNITED STATES DISTRICT COURT - CENTRAL DISTRICT OF CALIFORNIA BY USING THE CENTRAL DISTRICT CM/ECF SYSTEM.

8
9

Participants in the case who are registered CM/ECF users will be served by the Central District of California CM/ECF system.

10
11
12

I further certify that some of the participants in the case may not be registered CM/ECF users.  I have mailed the foregoing \*\*\*\* by First-Class Mail, postage pre-paid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days, to the following non-CM/ECF participants:

13

[*NONE*]

14
15

Dated:  April 2, 2021

*Jennifer Beasley*
Jennifer Beasley

16
17
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT