CARROLL, KELLY, TROTTER & FRANZEN
JOHN C. KELLY (SBN 125609)
GABRIEL M. IRWIN (SBN 210916)
111 West Ocean Boulevard, 14th Floor
Post Office Box 226
Long Beach, California 90801-5636
Telephone No. (562) 432-5855 /
Facsimile No. (562) 432-8785
jckelly@cktflaw.com / gmirwin@cktflaw.com

Attorneys for Defendant, CITY OF ONTARIO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL TRIPPIEDI, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF ONTARIO, a government entity; and DOES 1-10, inclusive<br><br>Defendants. | CASE NO.: 5:20-CV-01190-AB-SHK<br><br>**DECLARATION OF MICHAEL P. GIBBENS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with Motion for Summary Judgment, or in the alternative Partial Summary Judgment; Statement Of Uncontroverted Facts; Declaration of Christopher Shaw; Declaration of Gabriel M. Irwin; Proposed Order; Proposed Judgment]<br><br>DATE: August 27, 2021<br>TIME: 10:00 a.m.<br>COURTROOM: 7B<br><br>Discovery Cut-Off: 7-8-21<br>Pre-Trial Conf.: 11-19-21<br>Trial: 12-7-21<br><br>**Honorable Andre Birotte, Jr.**<br>Complaint Filed: 6-11-20 |

///

I, MICHAEL P. GIBBENS, declare and state as follows:

1. I am a certified Expert/Consultant on Disabled Accessibility Compliance. The following facts are based upon my personal knowledge, and if called as a witness I could and would testify competently thereto.

2. I am a nationally recognized author, instructor and consultant on the interpretive and technical aspects of disabled accessibility compliance in commercial and residential applications for both public and private sectors.

3. I have developed and presented hundreds of seminars on compliance with State and Federal access laws and guidelines throughout the United States and I have more than 30 years of experience as a disabled accessibility compliance consultant.

4. In 1991, I authored the first nationally published manual for ADA compliance to facilitate facility assessments and barrier removals six months before the ADA first became enforceable in 1992.

5. I have authored eighteen books on disabled accessibility compliance. This includes the CalDAG 2020 (California Disabled Accessibility Guidebook), which is the only publication in existence that documents the most stringent requirements between the California State accessibility requirements and the ADA.

6. The California Council of the American Institute of Architects has recognized the CalDAG as the foremost subject source on combined state and federal disabled accessibility compliance in the State of California.

7. I have served as a founding member of the California Design Safety and Accessibility Advisory Board (State Access Board), having been appointed by the State Architect, and I have served for the past twenty-one plus years on the Accessibility Code Advisory Committee for the State Building Standards Commission, including serving five years as Chairman.

///

///

8. I am a California Certified Access Specialist (#054), and am certified as an Accessibility/Usability Specialist and Plans Examiner by the International Code Council (ICC Cert. #94343).

9. I have completed facility compliance audits on virtually every category of occupancy covered under Titles II and III of the ADA and have served clients with facilities in all 50 states.

10. I have both designed and constructed improvements for the retrofit of facilities to provide compliance with State and Federal accessibility mandates, and I am a consultant to a broad range of private businesses and governmental agencies.

11. I have authored voluminous published publications and articles in my field, and have conducted numerous seminars on the ADA, Title 24 and HCD/FHAA.

12. A true and correct copy of my Curriculum Vitae is attached hereto as Exhibit "A."

13. Based on my background, training, and experience, I am qualified to opine on the issues of compliance with the Americans with Disabilities Act by public entities such as the City of Ontario.

14. I have had the opportunity to review Plaintiff's Second Amended Complaint in this action. I have had the opportunity to review Plaintiff's responses to Interrogatories and Requests for Production in this case. I have had the opportunity to review the deposition of Daniel Trippiedi taken in this action. I have also had the opportunity to personally perform a physical inspection of the Toyota Arena in Ontario. I have finally had the opportunity to speak with Arena employee, Christopher Shaw, about this matter.

15. The opinions set forth in this declaration are based upon my background, education, training, and experience and upon my review of the above identified materials.

///

16. These opinions are offered in support of the Motion for Summary Judgment of City of Ontario. I may have additional opinions at the time of trial based upon my review of any additional materials collected in the course of discovery.

17. Based upon my review of the above mentioned documentation, I understand the following facts to be relevant in this matter:

   a. Plaintiff Daniel Trippiedi is a disabled individual, paralyzed from the armpits down to his feet.

   b. Plaintiff visited the Toyota Arena in the city of Ontario on October 20, 2019, in order to attend his step-daughter Claudia Uribe's graduation. On the date in question, Plaintiff traveled to the Toyota Arena ("Arena") with Ms. Uribe, his wife Glendy Trippiedi, and his Ms. Uribe's two children (plaintiff's grandchildren).

   c. Plaintiff contends when they arrived at the Arena, he was directed by parking attendants who told him which way to go to get to the disabled accessible parking areas. He alleges he then followed the directions of the several parking attendants along the route to the Arena parking lot. When he encountered the first bank of accessible parking stalls, adjacent to the Arena administrative offices, Plaintiff contends the spaces were all blocked off with metal rails.

   d. Plaintiff contends he then asked one of the parking attendants to move one of the rails to allow him to pull into one of the ADA spaces. In response, Plaintiff alleges he was told by an attendant that this area was restricted for this event and that Plaintiff could park in another area further down the way. The attendant allegedly told Plaintiff the attendant's superiors had instructed him that no one was to use the parking area in the ADA spaces near the entrance. Plaintiff contends that attendant then directed Plaintiff to another parking lot.

   e. Plaintiff let his stepdaughter disembark near the entrance. He then drove to another parking area, which Plaintiff contends was already partially full and did not have any ADA spaces nor any spaces close to the entrance. Plaintiff chose

DECLARATION OF MICHAEL P. GIBBENS IN SUPPORT OF MSJ

to park his van in a standard parking stall that was neither designed nor intended to serve as an accessible parking stall. He did not ask any Arena parking attendants to re-direct him to any of the other available accessible parking spaces on the site.

    f.    After parking, Plaintiff, his wife and two grandchildren traveled to the Arena entrance. To access the entrance, they traveled up an elevated walkway leading directly to the main entrance.

    g.    Plaintiff contends, had he been able to use the blocked off ADA parking spaces, he could have accessed an elevator to gain entrance to the Arena.

    h.    Once they were inside, Plaintiff and his family were then directed to a designated disabled seating area. Upon arriving at the seating area, Plaintiff contends he was advised by an Arena attendant he could only have one companion seat with him in the disabled seating area.

    i.    As Plaintiff's grandchildren were with him, Plaintiff was advised the children would be permitted to sit on the laps of Plaintiff and his wife. Alternatively, Plaintiff contends he was advised his wife could sit immediately below the disabled seating area with the two grandchildren. However, these options were not acceptable to Plaintiff.

    j.    Plaintiff alleges a second Arena attendant then presented to the disabled seating area. Plaintiff contends the first attendant stated to this second attendant "we have a troublemaker here." The situation was purportedly explained to the second attendant, though Plaintiff was ultimately not permitted to have his wife and two grandchildren all sit with him in separate seats in the disabled seating area.

    k.    Plaintiff's wife opted to sit directly below the disabled seating area with the two grandchildren, in full view of the Plaintiff.

    l.    After the event was over, Plaintiff contends he exited the Arena with his wife and grandchildren.

    m.    Plaintiff alleges, while traveling to an area where the graduates were gathering outside the Arena post-ceremony, he encountered a curb that prevented

1 | him from continuing along with the other people who were going to meet their graduates.

n. After backtracking to a sidewalk ramp, Plaintiff contends he asked an Arena parking attendant to move/open a railing to allow him to access an area of the parking lot, but that this request was refused.

o. Finally, Plaintiff contends when he arrived back to his van with his family, the van was purportedly blocked in by adjacent vehicles, allegedly making him unable to get to his van. Plaintiff admits he and his family made choices that resulted in being parked for a period of time before he could enter his van in order to exit the Arena parking lot to travel home.

p. Despite the alleged events at the Arena on October 20, 2019, Plaintiff did not make a complaint or lodge a complaint with anyone at the Arena regarding these purported events.

18. It is my professional opinion that the City of Ontario was not in violation of the ADA on October 20, 2019, and did not violate the ADA on said date.

19. It is my professional opinion that the City of Ontario did not deny Plaintiff full and equal accommodations at the Arena on October 20, 2019.

20. Based upon my review of the referenced materials in this matter, Plaintiff contends an alleged failure by City of Ontario to provide accessible parking spaces and an accessible route at the Arena on October 20, 2019.

21. I understand Plaintiff also alleges that a public accommodation must maintain in operable working condition those features of its facilities and equipment that are required to be readily accessible to and usable by persons with disabilities.

22. Plaintiff further alleges the failure to ensure that accessible facilities were available and ready to be used by Plaintiff is a violation of law.

23. However, there was no violation of the ADA by City of Ontario based upon the facts and the evidence in this action. There specifically is nothing which would substantiate a claim that City of Ontario failed in any form or fashion to

maintain in operable working condition those features of its facilities and equipment that are required to be readily accessible to and usable by persons with disabilities.

24. There is nothing to establish that even a single feature of the Arena facilities and/or equipment were not readily accessible to and usable by persons with disabilities on October 20, 2019.

25. It is my understanding Plaintiff contends because eight ADA/disabled parking stalls at the Arena were blocked off upon his arrival on October 20, 2019, the City of Ontario violated the ADA.

26. However, while eight disabled parking spaces were blocked off when Plaintiff visited the Arena on October 20, 2019, eight additional disabled accessible spaces had already been created in the Northeast Arena parking area to compensate for this on said date.

27. As such, on October 20, 2019, there would have been a total of no less than 31 disabled parking spaces available in Lots A1 and A2 to disabled Arena patrons, comprised of the 23 existing disabled parking spaces in these lots and the 8 additional disabled parking spaces added.

28. There were also an additional 4 disabled parking spaces located in Lot C2 on October 20, 2019. Further, an additional 10 disabled parking spaces were available in Lot E2. Finally, an additional 23 disabled parking spaces were available in Lot F5.

29. A total of no less than 68 disabled parking spaces were available at the Arena to Plaintiff and other disabled patrons for the October 20, 2019 graduation event. This establishes City of Ontario did not fail in any respect to provide accessible parking spaces to disabled patrons such as Plaintiff on the date in question, and did not violate the ADA.

30. The act of blocking off 8 disabled parking spaces at the Arena on October 20, 2019 was not a violation of the ADA.

31. Blocking off eight disabled parking stalls and in turn creating an additional eight disabled parking spaces in another portion of the Arena parking was not required by the ADA given the numerous other disabled parking spaces already available at the Arena.

32. The act of creating eight additional disabled parking spaces in response to blocking off the eight spaces in question in this case was reasonable and demonstrated a focus by City of Ontario on ensuring the rights of disabled patrons.

33. There was no legal requirement under the ADA, or any other law, for City of Ontario to place signage in the Arena parking lots directing disabled patrons to the locations of available disabled parking spaces.

34. Based upon my inspection of the Arena, all available disabled parking spaces at the Arena on October 20, 2019 had accessible routes to the Arena entrances, which complied with the ADA.

35. With respect to the elevated walkways which Plaintiff contends he utilized to access the entrance to the Arena, these walkways were created in compliance with the law, and the existence of these walkways provided full and equal accommodations to Plaintiff as a disabled individual.

36. City of Ontario was not required under the law to provide elevator access to disabled patrons in order to access the entrance to the Arena based upon the existence of the walkways which were in place.

37. Once inside the arena, it is my understanding based upon my review of the materials in this case that Plaintiff contends the City of Ontario violated the ADA by not accommodating his demands for three companion seats in the ADA seating area for his wife and two grandchildren.

38. City of Ontario was not required to accommodate these demands under the ADA, or any other law, by providing Plaintiff with three companion seats.

39. Plaintiff was permitted one companion seat in the ADA seating area, which was reasonable and did not violate the ADA.

40. There was no legal requirement that Plaintiff's demand for four seats in the ADA seating area be met by City of Ontario on the date in question, particularly in the absence of any advance request/notice by Plaintiff as to these seating accommodations.

41. As such, Plaintiff was not denied full and equal accommodations on the date in question with respect to the issues pertaining to Arena seating.

42. Based upon my review of the materials in this case, it is also my understanding that, following the graduation, Plaintiff contends he encountered a curb outside the arena while attempting to meet up with his stepdaughter. It is my understanding Plaintiff contends that he requested a metal railing be moved by an Arena attendant in order to permit Plaintiff to maneuver around this curb, a request which was allegedly denied.

43. There was no legal requirement under the ADA that this alleged railing be moved in order to accommodate Plaintiff's chosen path of travel outside the Arena. This is particularly true given the purposes of the metal railing, which was to establish a safe area outside the Arena exit for graduates to gather following the graduation ceremony.

44. It is my further understanding that Plaintiff contends, upon arriving at his vehicle following the graduation, his van was blocked by adjacent vehicles, and he chose not to gain access to his van for a period of time.

///
///
///
///
///
///
///
///

45. However, given the availability of an abundance of disabled parking spaces at the Arena on the date in question in compliance with the ADA, the fact that Plaintiff's vehicle was allegedly blocked resulting in delay was not the result of any violation of the ADA by the City of Ontario.

I declare under the penalty of perjury under the laws of the State of California the foregoing is true and correct.

Executed July 22, 2021 at Thousand Oaks, California

MICHAEL P. GIBBENS

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I hereby certify that on [DATE], I electronically filed the foregoing

DECLARATION OF MICHAEL P. GIBBENS IN SUPPORT OF MSJ

**DECLARATION OF MICHAEL P. GIBBENS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** with the clerk of the United States District Court - Central District of California by using the Central District CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the Central District of California CM/ECF system.

I further certify that some of the participants in the case may not be registered CM/ECF users. I have mailed the foregoing **** by First-Class Mail, postage pre-paid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days, to the following non-CM/ECF participants:

[*NONE*]

Dated: July _____, 2021

_____
Jennifer Beasley

# CERTIFICATE OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I hereby certify that on August 6, 2021, I electronically filed the foregoing **DECLARATION OF MICHAEK P. GIBBENS IN SUPPORT OF DEFENDNT'S MOTION FOR SUMMARY JUSGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** with the clerk of the United States District Court - Central District of California by using the Central District CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the Central District of California CM/ECF system.

I further certify that some of the participants in the case may not be registered CM/ECF users.  I have mailed the foregoing **** by First-Class Mail, postage pre-paid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days, to the following non-CM/ECF participants:

[*NONE*]

Dated:  August 6, 2021                                         *Jennifer Beasley*___
                                                                                   JENNIFER BEASLEY